WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Shawn C. Moseley, | No. CV-16-02294-PHX-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| Commissioner of Social Security Administration, | |
| Defendant. | |

Pending before the Court is Plaintiff Shawn C. Moseley's appeal, which challenges the Social Security Administration's decision to deny benefits. (Doc. 14.) For the reasons set forth below, this Court affirms.

## BACKGROUND

On March 29, 2015, Mr. Shawn Moseley filed an application for disability insurance benefits, alleging a disability onset date of September 10, 2012. (Tr. 18.) His claim was initially denied on July 16, 2015, and it was denied again upon reconsideration on October 6, 2015. (*Id.*) Mr. Moseley then filed a written request for a hearing and he testified before Administrative Law Judge ("ALJ") Patricia Bucci on February 3, 2016. (Tr. 18.) On February 22, 2016, the ALJ issued a decision finding Mr. Moseley not disabled. (Tr. 35.)

In evaluating whether Mr. Moseley was disabled, the ALJ undertook the five-step sequential evaluation for determining disability.[1] (Tr. 15–16.) At step one, the ALJ

---

[1] The five-step sequential evaluation of disability is set out in 20 C.F.R. § 404.1520 (governing disability insurance benefits) and 20 C.F.R. § 416.920 (governing

found that Mr. Moseley had not engaged in substantial gainful activity since September 10, 2012.[2]  (Tr. 20.)  At step two, the ALJ determined that Mr. Moseley suffered from the following severe impairments: degenerative disk disease status-post lumbar fusion, chronic mild compression of the thoracic and lumbar spine, obesity, and post-traumatic stress disorder.  (Tr. 21.)  At step two, the ALJ also determined that Mr. Moseley's hypertension, hyperlipidemia, gastroesophageal reflux disease, sleep apnea, and left foot neuroma were non-severe.  (*Id.*)  At step three, the ALJ determined that none of Mr. Moseley's severe impairments equaled or met the severity of any of the Social Security Administration's listed impairments.  (*Id.*)

At that point, the ALJ reached step four and made a determination of Mr. Moseley's residual functional capacity ("RFC"),[3] concluding that while Mr. Moseley could not perform his past relevant work, he could "perform a limited range of light work. Specifically, the claimant can lift and carry 20 pounds occasionally and 10 pounds

---

supplemental security income).  Under the test:

> A claimant must be found disabled if she proves: (1) that she is not presently engaged in a substantial gainful activity[,] (2) that her disability is severe, and (3) that her impairment meets or equals one of the specific impairments described in the regulations.  If the impairment does not meet or equal one of the specific impairments described in the regulations, the claimant can still establish a prima facie case of disability by proving at step four that in addition to the first two requirements, she is not able to perform any work that she has done in the past.  Once the claimant establishes a prima facie case, the burden of proof shifts to the agency at step five to demonstrate that the claimant can perform a significant number of other jobs in the national economy.  This step-five determination is made on the basis of four factors: the claimant's residual functional capacity, age, work experience and education.

*Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007) (internal quotation marks and citations omitted).

[2] The record reflects that Mr. Moseley was self-employed as a realtor for a brief period following his alleged onset date.  (*Id.*)  During that time, he earned roughly 2,141.00 in 2014.  (*Id.*)  The ALJ determined, and neither party contests, that this sum did not rise to the level of substantial gainful activity.  (*Id.*)

[3] RFC is the most a claimant can do despite the limitations caused by his impairments.  *See* S.S.R. 96–8p (July 2, 1996).

frequently; stand and/or walk for four hours in an eight-hour workday; and sit for six hours of an eight-hour workday." (Tr. 24.) The ALJ also specified that "the claimant is limited to occasional interaction with the public, coworkers, and supervisors. Moreover, he can work in the vicinity of others, but not in tandem, and would be limited to occasional exposure of excessive loud noise." (*Id.*) Finally, at step five the ALJ determined that Mr. Moseley could perform jobs that exist in significant numbers in the national economy, specifically as a sorter or an assembler. (Tr. 35.)

The Appeals Council declined to review the decision. (Tr. 1–3.) Mr. Moseley filed the complaint underlying this action on July 12, 2016 seeking review of the ALJ's denial of benefits. (Doc. 1.) The matter is now fully briefed. (Docs. 14, 15, 16.)

## DISCUSSION

### I. Legal Standard

A reviewing federal court need only address the issues raised by the claimant in the appeal from the ALJ's decision. *See Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001). A federal court may set aside a denial of disability benefits only if that denial is either unsupported by substantial evidence or based on legal error. *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). Substantial evidence is "more than a scintilla but less than a preponderance." *Id.* (quotation omitted). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." *Id.* (quotation omitted).

The ALJ is responsible for resolving conflicts in testimony, determining credibility, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "When the evidence before the ALJ is subject to more than one rational interpretation, we must defer to the ALJ's conclusion." *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004). This is so because "[t]he [ALJ] and not the reviewing court must resolve conflicts in evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citations omitted). However, the Court

"must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.' " *Id.* (citing *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989)). Nor may the Court "affirm the ALJ's . . . decision based on evidence that the ALJ did not discuss." *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003).

## II. Analysis

### A. The ALJ Committed Non-Prejudicial Error by Failing to Address Some Impairments During the Step-Two Analysis

Mr. Moseley contends that the ALJ erred by failing to categorize his sacroiliac ("SI") joint disorder, left thigh neuropathy, and left foot neuroma as severe. In order to be considered severe, an impairment "must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1509. "In the absence of a showing that there is a 'medically determinable physical or mental impairment,' an individual must be found not disabled at step 2 of the sequential evaluation process." S.S.R. 96-4P, 1996 WL 374187, at *1 (July 2, 1996). Furthermore, "[n]o symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment." *Id.*

Mr. Moseley concedes in his Reply that he "did not claim a prejudicial error at step 2." (Doc. 16 at 1.) This amounts to a concession that substantial evidence supports the ALJ's determinations despite whatever errors she may have made. Thus there is no need for further analysis of Mr. Moseley's objection to the ALJ's analysis at step two, as even if error is present, he concedes that it would not constitute reversible error under the harmless error standard. *See Burch v. Barnhart*, 400 F.3d 676, 684 (9th Cir. 2005) (affirming the ALJ following application of the harmless error standard to an error at step two). The findings of the ALJ at step two are affirmed.

### B.     Weighing Medical Opinions

"Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995), *as amended* (Apr. 9, 1996).   The opinions of treating physicians are entitled to greater weight than the opinions of examining physicians, whose opinions are in turn entitled to greater weight than nonexamining physicians. *Id.* "[T]he Commissioner must provide 'clear and convincing' reasons" for rejecting the uncontradicted opinion of a treating or examining physician. *Id.*   However, if a treating or examining physician's opinion is contradicted, then his opinion may be "rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Id.* at 830–31.

### 1.     Dr. Rappoport

Dr. Rappoport has treated Mr. Moseley for reoccurring back pain since 2009.   He opined that Mr. Moseley has severe limitations that preclude him from employment. Specifically, he determined that Mr. Moseley can sit and stand for less than two hours at a time, and that Mr. Moseley would need to switch positions every twenty minutes.   (Tr. 859.)   Dr. Rappoport also determined that Mr. Moseley's severe pain would force him to miss more than six days of work per month, and that he would be off-task for more than twenty percent of the work day due to his pain levels.   (Tr. 860.)

The ALJ "afford[ed] minimal weight to the opinions of Dr. Rappoport."   (Tr. 30.) In doing so, the ALJ noted that 1) it appeared that Dr. Rappoport relied on the claimant's subjective complaints, 2) Dr. Rappoport's treatment notes were inconsistent with such severe limitations and 3) Dr. Rappoport's findings were inconsistent with the most recent objective medical evidence.   (Tr. 30–31.)   Mr. Moseley contends that these rationales are insufficient for discrediting Dr. Rappoport's opinions.

The ALJ failed to support his assertion that Dr. Rappoport relied too heavily on the claimant's subjective reports.   "An ALJ may reject a treating physician's opinion if it

is based to a large extent on a claimant's self-reports that have been properly discounted as incredible," but this generally applies where there is "little independent analysis or diagnosis." *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008). Further, "when an opinion is not more heavily based on a patient's self-reports than on clinical observations, there is no evidentiary basis for rejecting the opinion." *Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th Cir. 2014). The record in this case reflects that Mr. Moseley's medical conditions were verified through diagnostic tests beyond the claimant's self-reported symptoms, and the ALJ offered no basis for his assertion that Dr. Rappoport relied too heavily on Mr. Moseley's self-reports. Thus, the ALJ erred in considering this factor while weighing Dr. Rappoport's opinion.

The ALJ properly considered, however, the contradictions between Dr. Rappoport's treatment notes and his disability assessment in determining how much weight to give to Dr. Rappoport's medical opinion. "[C]onflict between treatment notes and a treating provider's opinions may constitute an adequate reason to discredit the opinions of a treating physician or another treating provider." *Ghanim*, 763 F.3d at 1161. The ALJ noted that in September of 2014 Dr. Rappoport described an MRI of Mr. Moseley's lumbar spine as "pristine," and that Dr. Rappoport could not detect any neural compression at that time. (Tr. 30–31, 325.) The ALJ went on to note that in December of 2014, Dr. Rappoport explained that while Mr. Moseley did appear to have some tenderness over both SI joints, he did not believe that this pain was coming from his lumbar spine because Mr. Moseley's symptoms did not correlate with such a finding even if an EMG test suggested that it was the cause. (Tr. 30–31, 323.) Despite these findings, Dr. Rappoport ultimately opined that Mr. Moseley's status-post lumbar spine fusion was an impairment that affected his ability to function. (Tr. 859.) The ALJ properly considered these inconsistences while weighing Dr. Rappoport's opinion. (Tr. 30–31, 325, 859.)

The ALJ also properly considered the inconsistency between the extent of the limitations contained in Dr. Rappoport's opinion and the objective medical evidence. An

ALJ may properly reject the opinion of a treating physician if it is inconsistent with the objective medical evidence of the record. *See Batson*, 359 F.3d at 1195 ("Further, an ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole, or by objective medical findings" (citation omitted)). The ALJ specifically noted that Dr. Rappoport's opinion was contradicted by the most recent MRI of Mr. Moseley's lumbar spine, taken in October of 2015, which demonstrated only "mild wedge compression fractures and no central canal stenosis." (Tr. 31, 779.) Likewise, the ALJ also noted that the most recent MRI of Mr. Moseley's SI joints "revealed unremarkable findings," which is at odds with the extreme limitations noted by Dr. Rappoport. (Tr. 31, 776.)

### 2. Dr. Hurd

Dr. Hurd was an examining consultative psychologist that met Mr. Moseley on one occasion. He subsequently determined that Mr. Moseley could remember and understand instructions and work-like procedures; maintain attention and concentrate to carry out instructions; and "respond appropriately to supervision." (Tr. 31.) However, Dr. Hurd also determined that Mr. Moseley was likely to respond to changes at work inappropriately and "may take extreme measures to protect himself and coworkers while on the job." (Tr. 31.) The ALJ afforded Dr. Hurd's opinion partial weight because he determined that 1) the record did not support the extent of the limitations outlined by Dr. Hurd, specifically Dr. Hurd's assertion that Mr. Moseley "may take extreme to protect himself and coworkers while on the job," and 2) the opinion contained "vague limitations with no specific work-related limitations."

An ALJ may reject a physician's opinion if the medical record does not support the physician's findings. *See Batson*, 359 F.3d at 1195. The ALJ in this case noted that while the medical record supported Dr. Hurd's opinion that Mr. Moseley "would be limited in his ability to deal with the general public," it did not support Dr. Hurd's assertion that Mr. Moseley may act in an "extreme" manner at times. (Tr. 32.) Substantial evidence supports the ALJ's findings, and thus he did not err. *Lester*, 81 F.3d

830−31.

The ALJ noted that in mental status examinations in January, April, and May of 2015, Mr. Moseley demonstrated "good eye contact, intact impulse control, no suicidal ideation, logical thought process, normal insight and judgment, and intact memory." (Tr. 32, 812, 817, 828−29, 833−34.) The ALJ acknowledges that these records indicate some trouble being around others. (Tr. 32.) The medical notes cited by the ALJ detailed that Mr. Moseley needed to "avoid people due to his 'crankiness' when he is in pain." (Tr. 32, 812.) Other records cited by the ALJ noted that Mr. Moseley admitted a "mild resistance to change" and a "feel[ing] of fear for personal safety/physical integrity." (Tr. 32, 834, 829.) However, the ALJ properly determined that the mental status examinations themselves, which indicate intact impulse control and a logical thought process, did not support Dr. Hurd's opinion that Mr. Moseley was at risk of acting in an "extreme manner" to protect himself. (Tr. 32.)

The ALJ also noted that Dr. Hurd only treated Mr. Moseley on a single occasion. The length of the treating relationship is a valid factor to consider when assigning weight to a physician's opinion. *See* 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").

However, the ALJ erred by summarily dismissing Dr. Hurd's findings as "contain[ing] vague limitations with no specific work limitations." (Tr. 32.) A medical opinion may be discredited for being conclusory, but such was not the case here. *See Meanel v. Apfel*, 172 F.3d 1111, 1113–14 (9th Cir. 1999), *as amended* (June 22, 1999) (permitting ALJ to discredit a physician's opinion because it was "conclusory and unsubstantiated by the medical record"). Rather, Dr. Hurd provided a detailed summary of which aspects of Mr. Moseley's life were affected by his PTSD, including his understanding and memory, sustained concentration and persistence, social interaction, and ability to adapt. (Tr. 485−6.) Dr. Hurd's opinion then continued on to explain how these effects could limit him in a workplace environment. (*Id.*) Therefore, the ALJ erred

in dismissing Dr. Hurd's findings as vague.

### 3. The ALJ's Errors in Weighing the Testimony of Dr. Hurd Did Not Constitute Prejudicial Error

Once it has been determined that an ALJ made an error during the review of a claimant's file, the next step is to determine whether the error was prejudicial. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008) (applying the harmless error standard after determining that two of the ALJ's reasons supporting his adverse credibility finding were invalid). Ninth Circuit precedents "do not quantify the degree of certainty needed to conclude that an ALJ's error was harmless." *Marsh v. Colvin*, 792 F.3d 1170, 1173 (9th Cir. 2015). However, "where the magnitude of an ALJ error is more significant, then the degree of certainty of harmlessness must also be heightened before an error can be determined to be harmless." *Id.*

The ALJ erred by classifying Dr. Hurd's opinions as "vague." However, the ALJ did provide two other specific and legitimate reasons for discounting the more significant limitations in Dr. Hurd's opinion. Namely, the ALJ noted that the more severe of Dr. Hurd's limitations were not supported by the mental status examinations, and Dr. Hurd only treated Mr. Moseley on a single occasion. These were both valid reasons for discounting Dr. Hurd's opinion. Therefore, substantial evidence continues to support the ALJ's weighing of the medical testimony even in the presence of these errors. Thus, the ALJ'S findings are affirmed. *See Carmickle*, 533 F.3d at 1162 (finding that an error is harmless where substantial evidence still supports the ALJ's findings).

### 4. Dr. Teed

Dr. Teed is an examining psychologist for Veteran's Affairs. Dr. Teed diagnosed Mr. Moseley with PTSD. (Tr. 759.) She also determined that Mr. Moseley is capable of "understanding and remembering short and simple instructions," but found that he may struggle as instructions become increasingly complex. (Tr. 757.) Additionally, Dr. Teed found that Mr. Moseley "may struggle with working with the general public and may have difficulty responding to criticism from supervisors." (Tr. 757.) Dr. Teed's report

does not seem to conclude that Mr. Moseley is unable to work at all. Nevertheless, the ALJ afforded Dr. Teed's opinion little weight because she determined that "the record fail[ed] to establish a consistent treating relationship" and the "drastic limitations" outlined by Dr. Teed were "inconsistent with recent treatment records received from the VA." (Tr. 32.)

An ALJ may discount the opinion of an examining physician if the treating relationship is inconsistent. *Garrison*, 759 F.3d at 1012 n.11; 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."). Mr. Moseley does not contest the ALJ's finding that his treating relationship with Dr. Teed was "inconsistent," and this is a valid reason to discount Dr. Teed's opinion.

An ALJ may also consider inconsistencies between an examining physician's opinion and his treatment notes while weighing his opinion. *See Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009) (affirming an ALJ's decision to discredit the findings of a treating psychologist due to inconsistencies between his opinion and his treatment notes). The ALJ determined that the extent of the limitations outlined by Dr. Teed was inconsistent with the treatment records. In support of this, the ALJ noted that in August of 2015, Mr. Moseley underwent a mental status examination that indicated "a cooperative attitude, a depressed and anxious mood, full range and appropriate affect, no hallucinations, logical and goal oriented thought content, adequate impulse control, fair insight and judgment, intact cognition, and intact memory." (Tr. 32, 552−554.) A mental status exam in October of 2015 supported these findings, as Mr. Moseley again presented with a depressed and anxious mood, but also exhibited "cooperative rapport, good eye contact, a full range effect, fair insight, adequate judgment, normal thought processes, and intact cognition." (Tr. 32, 750−751.) The ALJ noted that these mental status exams did not comport with the extent of the limitations outlined by Dr. Teed. (Tr. 32.) She also noted that on both of these occasions,

Mr. Moseley indicated that he was improving with medication. (Tr. 32, 552, 758.) Dr. Teed's treatment notes support this, as she noted that she believed Mr. Moseley would improve in time. (Tr. 758.)

These records also continue to develop Mr. Moseley's struggles with PTSD and his limitations engaging with the general public. For example, in October of 2015, Mr. Moseley relates that a recent lightning storm led him to taking cover under a couch in his living room. (Tr. 750.) In August of 2015, he told Dr. Teed that normal instances such as hearing a garbage truck hitting a speed bump could alarm him. (Tr. 758.) Mr. Moseley claims that these treatment notes bolster his claim that the ALJ erred in discrediting Dr. Teed's opinion. However, the ALJ did not appear to discredit Dr. Teed's opinion to the extent that it detailed Mr. Moseley's limitations in regard to his PTSD triggers, as her ultimate RFC reflected that Mr. Moseley's PTSD limited his ability to engage with the public and limited his exposure to loud noises. (Tr. 24.) Rather, the ALJ apparently discounted the Dr. Teed's opinion to the extent that it indicated that Mr. Moseley's mental health impairments challenged his ability to recall instructions or remain motivated. This was not error, as the ALJ cited to specific mental status examinations that were inconsistent with Dr. Teed's conclusions regarding Mr. Moseley's ability to understand instructions and exercise judgment. (Tr. 32.)

## C. Weighing Credibility

Once a claimant establishes that objective medical evidence illustrates an impairment that could reasonably cause the symptoms alleged, "and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" *Garrison v. Colvin*, 759 F.3d 995, 1014–15 (9th Cir. 2014) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 2006)). This is the most stringent standard required in Social Security cases. *Id.* To meet it, an ALJ must identify which testimony she considers not credible, and "link that testimony to the particular parts of the record supporting her non-credibility determination." *Id.* The ALJ's opinion "must be sufficiently specific to allow

a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain." *Bunnell v. Sullivan*, 947 F.2d 341, 345–46 (9th Cir. 1991) (internal quotations and citations omitted).

When determining credibility, an ALJ may consider a variety of factors, including: the treatment the claimant sought and received, the type of medication he takes, the measures he's taken to relieve his pain, and the location, duration, frequency, and intensity of his pain. 20 C.F.R. § 404.1529(c)(3). The ALJ can also consider a multitude of non-medical factors, including:

> (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.

*Smolen v. Chater*, 80 F.3d at 1284. However, "it is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment." *Garrison*, 759 F.3d at 1017.

Mr. Moseley testified that his medical conditions make it impossible for him to sit for more than 45 minutes or stand for more than 15 minutes at a time. (Tr. 25.) He estimated that he could walk roughly 100 yards, and that he can only lift 10 to 15 pounds. (*Id.*) He also testified that he experiences nightmares and flashbacks due to his PTSD, and that he suffers from anxiety when he is around too many people at once. (*Id.*) He also suffers from crying spells roughly once a month, which last about two hours at a time. (*Id.*) The ALJ ultimately determined that while his medical conditions could reasonably be expected to cause such symptoms, Mr. Moseley was not entirely credible for the following reasons.

///

///

### 1. Inconsistencies with the Medical Record

"Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis." *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005); *see Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) ("While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects."). Furthermore, "evidence of conservative treatment is sufficient to discount a claimant's testimony regarding severity of an impairment." *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) (internal quotation marks omitted); *see also Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits."). However, "it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." *Garrison*, 759 F.3d at 1017.

The ALJ provided a comprehensive summary of Mr. Moseley's physical health history, and ultimately concluded that the objective medical evidence did not support his claims of debilitating back pain. (Tr. 26−28.) In 2013 Mr. Moseley's treating physician, Dr. Rappoport, claimed that he was doing "very well" until he started realtor school. (Tr. 33, 336.) The increased amount of time sitting led Mr. Moseley to develop back pain, but Mr. Moseley appeared to improve with physical therapy, at one point noting that his pain was a three out of ten. (Tr. 33, 331, 416.) The ALJ also noted that from 2013 until 2014, Mr. Moseley's MRI looked "pristine," and that this clinical evidence contradicted Mr. Moseley's allegations of disabling pain. (Tr. 26, 325.) The ALJ noted that in 2015, an EMG showed a "possible L3-L4 radiculopathy," but Dr. Rappoport noted that "such findings did not correlate with the claimant's symptoms." (Tr. 27, 323.) Mr. Moseley recently underwent MRIs for his back and his SI joint. (Tr. 27, 776, 777−780) While the back MRI showed some deterioration, both MRIs revealed largely unremarkable findings

that were inconsistent with the extent of the limitations Mr. Moseley described.  (Tr. 27.)  In all, the ALJ concluded that the "benign objective, normal clinical" record was "inconsistent with the claimant's allegations."  (Tr. 27.)  The ALJ relied on substantial evidence in making this finding, and thus she did not err.

The ALJ also provided a summary of Mr. Moseley's mental health record.  She noted that from 2014 onward, Mr. Moseley has experienced "some stresses related to post-traumatic stress disorder," but that he has never required hospitalization.  (Tr. 28.)  Furthermore, he scored 29 out of 30 on a mini-mental status examination in 2015. (Tr. 28, 483−84.)  He regularly appeared before his doctors with fair insight and intact cognition, although at times he also appeared stressed.  (Tr. 29, 750−51.)  The ALJ noted that Mr. Moseley's PTSD seemed to improve with medication, and on various occasions Mr. Moseley noted that medication helped with his nightmares.  (Tr. 28−29, 552, 554, 758.) The ALJ reasonably considered the medical record as a whole to find that the clinical findings did not support the extent of the symptoms Mr. Moseley described, and thus the ALJ did not err.

### 2.      Mr. Moseley's Daily Activities

A claimant's testimony may be discredited if an activity described by the claimant is inconsistent with her alleged limitations.  *See Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) ("If the claimant runs marathons, as an extreme example, an ALJ could reasonably assume that the claimant's pain is not so debilitating as to prevent him from working.").  However, "ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day." *Garrison*, 759 F.3d at 1016.  Furthermore, "[t]he Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication." *Smolen*, 80 F.3d at 1284 n.7.

Mr. Moseley testified that he "is able to attend to his personal needs, but that he has to sit down in the shower." (Tr. 25.) He also stated that he is capable of cooking simple meals, loading the dishwasher, driving twice a week, attending church services once a week, and shopping once a week for an hour or so. (Tr. 25.) The record also indicates that Mr. Moseley was able to work as a self-employed realtor after the onset date for a brief period, and that he attended real estate school during the period of disability. (Tr. 29.) Real estate school required Mr. Moseley to attend classes three days a week for an hour and a half for seven weeks. (Tr. 29.) In November of 2014, Mr. Moseley was capable of attending and enjoying his daughter's wedding. (Tr. 29.) The ALJ determined that these activities indicated that Mr. Moseley's reports of debilitating pain are less than credible. (Tr. 29.)

This constituted error. None of Mr. Moseley's daily activities are easily transferable to a work environment or inconsistent with his testimony regarding his pain. Mr. Moseley's testimony reflects that he is only capable of managing his personal hygiene and performing the most basic of household chores. Even then, he reported that such activities often prove to be a challenge for him, and he is forced to take steps, such as sitting down in the shower, to accomplish them. Real estate school did force him to sit for an hour and a half at a time, but this is not inconsistent with an individual who is capable of attending weekly church services and occasionally shopping. Likewise, Mr. Moseley's attempt to maintain employment as a realtor does not discredit his testimony regarding his physical pain, as he ultimately quit attempting to work due to his pain levels. Furthermore, Mr. Moseley's ability to attend his daughter's wedding is not probative of his ability to maintain consistent attendance or performance in a work environment. Therefore, the ALJ erred in determining that Mr. Moseley's activities discredited his symptom testimony.

However, while some of these activities may not be probative of Mr. Moseley's credibility in regards to his physical pain, they are probative of his alleged limitations due to his PTSD. Mr. Moseley related that encountering strangers and being around others is

difficult for him. (Tr. 28.) Yet, Mr. Moseley testified that he is able to attend weekly church meetings. Mr. Moseley also related that he had trouble completing his real estate class due to his pain levels, not due to his mental limitations. These activities presumably force Mr. Moseley to engage with large groups of people that he likely does not know, and are therefore probative of his credibility regarding his mental limitations. However, his ability to attend a one-time family function, such as his daughter's wedding, is not. To the extent that the ALJ discredited Mr. Moseley's PTSD symptom testimony due to his ability to enjoy his daughter's wedding, she erred.

### 3. Mr. Moseley's Appearance at the Hearing

An ALJ may consider a claimant's appearance at the hearing while considering the claimant's credibility. *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007). However, "[t]he ALJ's observations of a claimant's functioning may not form the sole basis for discrediting a person's testimony." *Id.* The ALJ noted that Mr. Moseley's "generally unpersuasive appearance and demeanor while testifying at the hearing" influenced her credibility analysis. (Tr. 29.) She also explained that this was "only one among the many [factors] relied on in reaching a conclusion regarding the credibility of the claimant's allegations." (Tr. 29.)

### 4. The ALJ's Errors in the Credibility Determination were not Prejudicial

An error in determining credibility is prejudicial unless "there remains 'substantial evidence supporting the ALJ's conclusions on . . . credibility' and the error 'does not negate the validity of the ALJ's ultimate [credibility] conclusion.'" *Carmickle*, 533 F.3d 1155, 1162 (9th Cir. 2008) (quoting *Batson*, 359 F.3d at 1197). Due to the ALJ's errors in considering Mr. Moseley's daily activities, the only two factors that supported discrediting Mr. Moseley's testimony are the ALJ's interpretation of his appearance at the hearing and the objective medical evidence.

When combined, these factors provide substantial evidence to support the ALJ's credibility determination. *See generally Orn*, 495 F.3d at 639 (finding that a Claimant's

personal appearance can be used "in the overall evaluation of the credibility of the individual's statements." (internal quotation omitted)); *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997), *as amended on reh'g* (Sept. 17, 1997) ("[A] a finding that the claimant lacks credibility cannot be premised wholly on a lack of medical support for the severity of his pain."). The ALJ properly determined that the extent of Mr. Moseley's symptom testimony was inconsistent with the medical record. She also determined that his demeanor at the hearing was less than persuasive. Thus the ALJ's findings regarding Mr. Moseley's credibility are affirmed.

### D.     The VA Disability Rating

"[A]n ALJ must ordinarily give great weight to a VA determination of disability." *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002). This is so because the two programs share the same goal of "providing benefits to those unable to work because of a serious disability" and "evaluate a claimant's ability to perform full-time work in the national economy on a sustained and continuing basis" by focusing on "analyzing a claimant's functional limitations." *Id.* However, a finding of disability by the VA does not compel the ALJ to find disability as well, and "the ALJ may give less weight to a VA disability rating if he gives persuasive, specific, valid reasons for doing so that are supported by the record." *Id.* For example, an ALJ may give less weight to a VA disability rating where the ALJ "had evidence the VA did not, which undermined the evidence the VA did have." *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 695 (9th Cir. 2009).

To the extent that the ALJ rejected the VA's disability rating due to the difference of criteria between the two programs, she erred. *McCartey* clarified that while the two programs are different, the similarities in their functions and goals requires an ALJ to do more than point to the programs' differences to justify rejecting the evidentiary significance of a VA disability rating. *McCartey*, 298 F.3d at 1076; *see also Valentine*, 574 F.3d at 695 ("Insofar as the ALJ distinguished the VA's disability rating on the general ground that the VA and SSA disability inquiries are different, her analysis fell

afoul of *McCartey*.").

However, since *McCartey*, the Ninth Circuit has upheld an ALJ's decision to afford less weight to a VA disability rating where the ALJ acknowledges that her record contains evidence that was not available to the VA when it made its determination, or where the ALJ notes that the VA's disability rating "rested on an opinion that the ALJ rejected." *Valentine*, 574 F.3d at 695. The ALJ in this case determined that much of the VA's disability screening appeared to focus on Mr. Moseley's subjective complaints, which the ALJ discredited due to the credibility evidence she had available to her. The ALJ also noted that the evidence she relied upon in making her adverse credibility determination was not available to the VA. (Tr. 31.) Thus, as in *Valentine*, the ALJ determined that the VA's decision "rested on an opinion that the ALJ rejected." *Valentine*, 574 at 695. The ALJ properly determined that the acquisition of new evidence as to Mr. Moseley's credibility, provided a persuasive, specific, and valid reason for discrediting the VA's findings, and thus it was not error for the ALJ to discount the evidentiary weight of the VA's disability rating. *See Valentine*, 574 F.3d at 695 ("We thus conclude that, on this record, the acquisition of new evidence or a properly justified reevaluation of old evidence constitutes a 'persuasive, specific, and valid reason[] . . . supported by the record' under *McCartey* for according little weight to a VA disability rating." (quoting *McCartey*, 298 F.3d at 1076)).

In *Valentine*, the Ninth Circuit addressed a very similar error made by the ALJ, and ultimately determined that the error was not prejudicial due to the presence of a single legitimate reason to discount the findings of the VA. . Therefore, to the extent that the ALJ attempted to improperly discount the findings of the VA due to the differences between the VA's process and the Social Security Disability's process, the error was not prejudicial.

### E. Mr. Moseley's Wife's Testimony

"Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony

and gives reasons germane to each witness for doing so." *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001).

The record contains reports from Gail Moseley, Mr. Moseley's wife, to bolster the testimony of Mr. Moseley regarding his limitations. The ALJ gave little weight to these reports because 1) Mrs. Moseley, by virtue of her relationship with Mr. Moseley, could not be considered a disinterested third person, 2) Mrs. Moseley is not a medical professional, and 3) Mrs. Moseley's reports were largely inconsistent with the objective medical record. (Tr. 33.) Mr. Moseley contends that these reasons are insufficient to reject his wife's testimony.[4]

The fact that Mrs. Moseley is married to Mr. Moseley, and thus may express views that are "colored by affection for the claimant" is not alone sufficient to discount her testimony. (Tr. 33); *See Smolen v. Chater*, 80 F.3d 1273, 1289 (9th Cir. 1996) ("The fact that a lay witness is a family member cannot be a ground for rejecting his or her testimony."). This is because "testimony from lay witnesses who see the claimant every day is of particular value" and "such lay witnesses will often be family members." *Id.* Therefore, the ALJ erred in discrediting Mrs. Moseley's testimony if he did so solely due to her relationship with Mr. Moseley.

Affording little weight to Mrs. Moseley's reports due to her lack of medical training was also improper, as the regulations affirmatively state that the ALJ should consider the testimony of those without medical training. *See Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987) ("Disregard of this evidence violates the Secretary's regulation that he will consider observations by non-medical sources as to how an impairment affects a claimant's ability to work."). The Ninth Circuit has repeatedly

---

[4] Mr. Mosely raises the entirety of his objection to the ALJ's rejection of his wife's reports in a conclusory footnote in his opening brief. This approach is greatly disfavored, and it is unclear whether this Court has an obligation to address such an objection at this stage in the proceedings. *Hilao v. Estate of Marcos*, 103 F.3d 767, 778 (9th Cir. 1996) ("The summary mention of an issue in a footnote, without reasoning in support of the appellant's argument, is insufficient to raise the issue on appeal.").

emphasized the important role that non-medical testimony plays in assessing a claimant's limitations. *See Lewis*, 236 F.3d at 511 ("Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so."); *Smolen*, 80 F.3d at 1288 ("[T]he Commissioner will consider observations by nonmedical sources about how impairments affect a claimant's ability to work."); *Sprague*, 812 F.2d at 1232 ("Descriptions by friends and family members in a position to observe a claimant's symptoms and daily activities have routinely been treated as competent evidence."). Therefore, discounting Mrs. Moseley's testimony due to her lack of medical training constituted an error.

However, an ALJ may discredit a lay person's testimony where it is contradicted by the medical evidence of the record. *See Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001) ("One reason for which an ALJ may discount lay testimony is that it conflicts with medical evidence."). The ALJ in this case did not err in noting that Mrs. Moseley's reports were "simply not consistent with the preponderance of the opinions and observations by medical doctors in this case." (Tr. 33.) Therefore, the ALJ did have one germane reason for discrediting Mrs. Moseley's testimony.

Having determined that the ALJ erred, the next step is to consider whether her errors are prejudicial. Inconsistency between the medical records and a lay witness's testimony provides substantial evidence for discounting a lay witness's testimony. *See Lewis*, 236 F.3d at 511−12 (finding that inconsistencies between the medical record and the lay witness's testimony provided substantial evidence for discounting the lay witness's testimony). Therefore, while the ALJ erred, her error was not prejudicial, and thus the ALJ's decision to discount Mrs. Moseley's testimony is affirmed.

///
///
///
///

**CONCLUSION**

For the foregoing reasons, this Court finds that the ALJ did not commit prejudicial error.

**IT IS THEREFORE ORDERED** that the ALJ's decision is **AFFIRMED.**

**IT IS FURTHER ORDERED** directing the Clerk of Court to terminate this case and enter judgment accordingly.

Dated this 6th day of July, 2017.

Honorable G. Murray Snow
United States District Judge